UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Norfolk Division

JTH TAX LLC d/b/a LIBERTY TAX
SERVICE f/k/a JTH TAX, INC.,
2387 Liberty Way
Virginia Beach, VA 23456

       Plaintiff,

v.

JOHN T. HEWITT,
2505 Olivia Court
Virginia Beach, VA 23454

LOYALTY LLC,
Serve: John Allen Waldrop
780 Lynnhaven Pkwy, Ste 240
Virginia Beach, VA 23452

ATAX LLC d/b/a ATAX,
Serve: Corporate Creations Network Inc.
425 W. Washington St., Ste. 4
Suffolk, VA 23434

ATAX FRANCHISE, INC.,
Serve: Rafael Alvarez
73 Market St., Ste. 372
Yonkers, NY 10710

And

YNEVA MARTE,
3013 Olinville Avenue #1
Bronx, NY 10467

       Defendants.

Case No.: 2:21-cv-00076

## VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES AND DEMAND FOR JURY TRIAL

Plaintiff, JTH Tax LLC d/b/a Liberty Tax Service ("Liberty"), for its Verified Complaint

against Defendants, John T. Hewitt ("Hewitt"), Loyalty LLC ("Loyalty"), ATAX LLC d/b/a ATAX ("ATAX"), ATAX Franchise, Inc. ("ATAX Franchise"), and Yneva Marte ("Marte"), alleges the following:

## PRELIMINARY STATEMENT

1.      Competition in the franchise industry is fierce.  Liberty and ATAX are head-to-head competitors in the nationwide franchising of tax preparation businesses.  ATAX's CEO – the Defendant Hewitt – also founded Liberty and was Liberty's CEO for more than twenty years.

2.      Liberty brings this action in response to Defendants' ongoing scheme to unfairly compete against Liberty by tortiously interfering with Liberty's contractual relationships with its franchisees, and converting Liberty's goodwill by confusing customers into thinking Liberty is still providing their tax services.  This unfair competition scheme is facilitated by Hewitt's using confidential information in violation of the Defend Trade Secrets Act, and in breach of the employment contract Hewitt entered as Liberty's CEO.  Specifically, Hewitt was intimately familiar with Liberty's confidential information, including information concerning its franchise profitability, its business strategies, and its franchise relationships and agreements.  Hewitt had an employment agreement with Liberty, in which he promised, among other things, that he would not use Liberty's confidential information following the termination of his employment in perpetuity. Hewitt, acting through or in concert with the other Defendants, has violated his employment agreement and misappropriated Liberty's confidential information to start a competing chain of tax preparation businesses.

3.      Hewitt knows that Liberty's franchisees are bound by restrictive covenants in their franchise agreements ("Agreements"), which prohibit them from competing against Liberty (within geographical limits) during the term of the Agreements and for two years following

termination, and also prohibit franchisees from soliciting Liberty's customers for two years after termination of the Agreements.  Hewitt knows from Liberty's many litigations against its former franchisees (including those filed while he was CEO) that the two-year non-competition obligation only begins to run once a franchisee is compliant with its post-termination obligations as set forth in the applicable franchise agreement.  Hewitt also knows that several of Liberty's former franchisees were and are currently restrained from competition with Liberty by way of injunctive relief entered by various Federal Courts throughout the country, including, but not limited to, this Court.

4.     Hewitt also knows that the Agreements require Liberty's former franchisees to assign leases to Liberty upon termination, so that Liberty can maintain its customer goodwill at profitable locations.  Hewitt, acting through or in concert with the other Defendants, has induced and continues to induce Liberty's current and former franchisees to breach their contractual obligations.  Moreover, Hewitt has induced Liberty's former franchisees to open competing ATAX tax preparation businesses at their former Liberty franchise locations, in violation of the former franchisees' contractual obligations.  Using confidential information that he was privy to as Liberty's CEO, Hewitt has targeted Liberty's most profitable franchises.  On information and belief, Hewitt also is using his knowledge of Liberty's history of allowing franchisees to terminate franchise agreement early in certain situations to counsel Liberty franchisees to trick Liberty into mutually terminating franchise agreements through false assertions that the franchisees intend to exit the industry.  On information and belief, based on Hewitt's guidance, several franchisees recently persuaded Liberty to mutually terminate franchise agreements based on claims they were exiting the tax preparation business, but then immediately became ATAX locations.

5.      At some former Liberty locations which have reopened as ATAX locations, Defendants are obscuring the fact that the locations have converted to ATAX by maintaining logos and trade dress that mimic Liberty's.  Moreover, Defendants' employees at the new ATAX locations have told prospective customers that the ATAX locations employ the same tax preparers as the previous Liberty franchises, and that "only the name changed," in an additional effort to capture Liberty's goodwill.

6.      Defendants' unfair competition scheme already has irreparably harmed Liberty, and will cause further irreparable harm if it is allowed continue.  Accordingly, in addition to an award of damages, Liberty seeks preliminary and permanent injunctions as set forth herein, to (among other things) enjoin Defendants from continuing to use Liberty's trade secrets, from continuing to tortiously interfere with Liberty's contractual relationships with current and former franchisees, and from continuing to mislead consumers by palming off their competing businesses as Liberty locations.

## PARTIES

7.      Plaintiff Liberty is a Delaware limited liability company with its principal place of business at 2387 Liberty Way, Virginia Beach, VA 23456.

8.      Defendant Hewitt is an individual, and upon information and belief, a citizen of Virginia, with a last known address of 2505 Olivia Court, Virginia Beach, VA 23454.

9.      Defendant Loyalty is a Virginia limited liability company with its principal place of business at 780 Lynnhaven Parkway, Suite 240, Virginia Beach, VA 23452.

10.     Defendant ATAX is a Virginia limited liability company with its principal place of business at 780 Lynnhaven Parkway, Suite 240, Virginia Beach, VA 23452.

11.    Defendant ATAX Franchise is a New York corporation, with its principal place of business at 73 Market Street, Suite 376, Yonkers, NY 10710.

12.    Defendant Yneva Marte is an individual who, upon information and belief, resides in New York, with a last known address of 3013 Olinville Avenue #1, Bronx, NY 10467.

## JURISDICTION AND VENUE

13.    This Court has original (federal question) subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1338 (trademark-related and unfair competition claims), and 18 U.S.C. § 1836 (the Defend Trade Secrets Act).

14.    This Court has supplemental subject matter jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a) because those claims are so related to Liberty's Lanham Act and Defend Trade Secrets Act ("DTSA") claims that they form part of the same controversy under Article III of the United States Constitution, including claims that involve the joinder or intervention of additional parties.

15.    The Court has personal jurisdiction over Defendants Hewitt, Loyalty, and ATAX because they are citizens of Virginia.  The Court has personal jurisdiction over ATAX Franchise, Inc. because it does business in Virginia and its business activities in Virginia are among those giving rise to this dispute, and it conspired with the other Defendants to cause harm to Liberty in Virginia.  The Court has personal jurisdiction over Marte because she does business in Virginia (including sending royalty and other payments to ATAX in Virginia, submitting a franchise application to ATAX in Virginia), her business activities in Virginia are among those giving rise to this dispute, and she conspired with the other Defendants to cause harm to Liberty in Virginia.

16.    Venue is proper to pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims at issue herein occurred in the Eastern District of

Virginia.  Defendant Hewitt's employment agreement with Liberty provided for exclusive venue in this District.

## FACTS

### A.     Hewitt/Liberty Background

17.     Hewitt founded Liberty in 1997, beginning with the purchase of a Canadian tax preparation business, and relocated Liberty to Virginia in 2000.

18.     As Liberty's CEO, Hewitt helped formulate Liberty's confidential and proprietary processes and procedures, including those concerning business strategy, franchise relationships and customer service.

19.     As Liberty's CEO, Hewitt had knowledge of every aspect of Liberty's business, including its trademarks and trade dress, franchise agreements, employees and processes for servicing customers, and profitability of particular franchisees.

20.     Further, as Liberty's CEO, Hewitt had to approve every deal, termination, and renewal of a franchise.

### B.     Hewitt's Employment Agreement with Liberty

21.     To protect Liberty's confidential information, proprietary business processes and goodwill, Liberty and Hewitt entered into an employment agreement, which they amended twice. A copy of the Second Amended and Restated Employment Agreement ("Hewitt Employment Agreement") dated July 1, 2016, is attached as Exhibit A.

22.     The Hewitt Employment Agreement stated:

> [Liberty] and [Hewitt] agree that [Hewitt] will have a prominent role in the management of the business, and the development of the goodwill of [Liberty] and will have access to and become familiar with or exposed to Confidential Information (as the term is defined [herein]), in particular, trade secrets, proprietary information, and other valuable business information of [Liberty] pertaining to [Liberty's] specialty business

6

involving income tax preparation, the electronic filing of income of tax returns, refund anticipation loans, or franchising of any of these activities . . .

[Hewitt] agrees that [Hewitt] could cause harm to [Liberty] if he . . . misappropriated or divulged [Liberty's] Confidential Information; and, as such, these legitimate business interest justify . . . restrictive covenants[.]

Ex. A ¶ 9.

23.     Hewitt further promised he would not directly or indirectly disclose "Confidential Information," or use it for his own benefit or the benefit of third parties, including Liberty's "marketing plans, business plans, financial information and records, operation methods, personnel information, computer databases and proprietary software programs, drawings, designs, information regarding product development, customer lists, or other commercial or business information and any other information not available to the public generally." *Id.* ¶ 9(a)(ii).

24.     Hewitt further agreed "…that in the event of any material breach by [Hewitt] of any of section of this Agreement that remedies at law may be inadequate to protect [Liberty], and, *without prejudice to legal or equitable rights and remedies otherwise available to [Liberty]*, [Hewitt] agrees to the granting of injunctive relief in [Liberty's] favor in connection with such breach or violation without proof of irreparable harm." (emphasis in original).  *Id.* ¶ 13.

25.     The Hewitt Employment Agreement's provisions regarding Confidential Information "survive the termination of [Hewitt's] employment," (*id.* ¶ 17), and run in perpetuity, (*id.* ¶ 9(a)(ii)).

**C.     Liberty's Franchise System**

26.     Liberty is the franchisor of Liberty Tax Service® income tax preparation service centers located throughout the United States and Canada.

27.     Liberty has spent substantial time and money advertising and promoting the distinctive and well-known Liberty Tax Service® system for over 20 years, which provides income tax preparation and filing services and products to the public.

28.     Liberty plays an important role in the national economy, with a network of over 21,000 tax preparers, and has grown to be one of the largest tax preparation franchises in the United States.

29.     Liberty has spent substantial time and money in identifying franchise opportunities and locations.

30.     Franchisees lease and operate under the Liberty Tax Service® system pursuant to franchise agreements.

31.     Liberty has disclosed certain confidential information and trade secrets, including Liberty's confidential operations manual, methods of operation of franchise, customer information and records, and marketing information, to franchisees.  This confidential information provides Liberty with a competitive advantage.  Liberty does not disclose such information except to parties bound by confidentiality obligations.

32.     Bound by the terms of the franchise agreements, franchisees may use Liberty's confidential and proprietary tools, information, and support during the term of the franchise agreements, and, in return, the franchisees pay fees to Liberty for opening franchises and royalties to Liberty.

**D.      <u>Franchisee Obligations Under the Franchise Agreements</u>**

33.     In exchange for Liberty's grant of a franchise allowing operation of tax return preparation businesses using Liberty's system by franchised businesses, franchisees agree to pay Liberty certain royalties and fees and to assume certain obligations during the term of the franchise

agreements, as well as after termination.  A copy of a representative franchise agreement for Bablu Shahabuddin ("Shahabuddin"), who operated Liberty franchises in Harlem and the Bronx (now wrongfully operating as ATAX locations, as discussed in more detail below), is attached as Exhibit B.

34.     While contract language may vary slightly depending when particular agreements were signed, the Shahabuddin franchise agreement impose essentially the same obligations as Liberty's franchise agreements with other franchisees.

35.     In Section 10(a) of the standard franchise agreements, franchisees agree to an in-term covenant not to compete, such that, during the term of the agreements, they will not directly or indirectly, for a fee or charge, prepare or electronically file income tax returns or offer financial products in the United States or Canada except in their capacity as Liberty Tax Service franchisees using the Liberty Tax Service® system to offer such products and services.

36.     In Section 10(b) of the standard franchise agreements, franchisees agree to a post-termination covenant not to compete for a period of two years following the termination, expiration, transfer or other disposition of the franchised business, committing to not directly or indirectly prepare or electronically file income tax returns within their franchise territories or within twenty-five miles of the boundaries of their franchise territories.

37.     In Section 10(d) of the standard franchise agreements, franchisees likewise agree to a non-solicit covenant, agreeing that for a period of two years following termination, they will not solicit the patronage of any person or entity served by any of their Liberty offices for the prior twelve months for the purpose of offering income tax preparation, electronic filing of tax returns, or financial products.

38.    In Section 12 of the standard franchise agreements, franchisees agree to refrain from interfering with or attempting to interfere with any of Liberty's business relationships or advantages, and from using any confidential information from Liberty's proprietary manuals and business system, following transfer, termination, expiration or nonrenewal of their franchise agreements for their own benefit, in perpetuity.

39.    These contractual provisions are necessary to protect Liberty's legitimate, protectable interest in their respective franchise businesses, including: (a) maintaining and protecting Liberty's goodwill and customer loyalty; (b) retaining customer relationships; (c); maintaining confidentiality of Liberty's customer lists, customer identification, tax returns, and other confidential information; and (d) preserving Liberty's ability to facilitate the operation of Liberty franchises where the franchise is currently located.

**E.    Hewitt Acquires ATAX and Launches Competing Chain**

40.    Since November 2018, Hewitt has owned and controlled Loyalty, and formed ATAX as a subsidiary of Loyalty on or about February 20, 2019.  Through ATAX, Hewitt acquired ATAX Franchise, which at the time was a small chain of tax preparation businesses.

41.    On May 31, 2019, Loyalty issued a press release announcing that ATAX Franchise had "joined Loyalty Brands to fuel their rapid national expansion."  The press release said "Loyalty Brands is an umbrella franchise company founded in 2018 by serial entrepreneur John Hewitt."  A copy of the press release, taken from Loyalty's website, is attached as Exhibit C.

42.     According to a Franchise Disclosure Document ("FDD") ATAX issued on April 30, 2020, ATAX "acquired the assets of ATAX Franchise, Inc., ATAX Software, Inc., and ATAX Cloud Bookkeeping, Inc.," on July 15, 2019.  The FDD is attached as Exhibit D.

43.     Hewitt and other ATAX employees started inducing current and former Liberty franchisees to join ATAX in breach of their franchise agreements.  Defendants have continued soliciting Liberty franchisees, as set forth in detail in section H, below.

44.     Hewitt used Liberty's confidential policies and procedures to advise Liberty franchisees to terminate their franchise agreements with Liberty via a mutual terminations under false pretenses that they are "getting out of the tax business," and then to join ATAX.

45.     Hewitt targeted certain Liberty franchisees for conversion to ATAX using knowledge of Liberty's tracking performance of franchisees that he obtained while he was Liberty's CEO.  As such, Hewitt knew which franchisees and franchise locations were most lucrative for Liberty.  Furthermore, due to his executive-level day-to-day experience and necessary approval, Hewitt knew intimate and highly confidential information about Liberty's practices and policies regarding its franchisee relationships, including how it approached and negotiated mutual terminations of franchise agreements and debt forgiveness.

46.     Defendants have opened ATAX franchises in at least five former Liberty locations that were highly profitable.

47.     Defendants' interference with Liberty's contractual relationship was intentional and intended to economically benefit Defendants and damage Liberty.

**F.      Defendants Induced Shahabuddin to Breach His Contract with Liberty and Assign Leases to ATAX Instead of Liberty.**

48.     Shahabuddin is a former Liberty franchisee who operated dozens of profitable Liberty locations throughout the New York metropolitan area, and now operates ATAX franchises in at least five former Liberty locations.

49.     Shahabuddin was terminated as a Liberty franchisee in 2016 pursuant to a Purchase and Sale Agreement ("PSA").  A true copy of the PSA is attached as Exhibit E.[1]  Hewitt signed the PSA on behalf of Liberty.

50.     The PSA required Shahabuddin to assign leases for Liberty franchise locations to Liberty upon Liberty's request.  Shahabuddin has refused to assign the leases to Liberty, in breach of the PSA and causing tremendous injury to Liberty, which is the subject (among other things) of litigation already pending in this Court, Civil Action No. 2:20-cv-217.

51.     In breach of his contracts with Liberty, at least six franchise locations in New York City for which Shahabuddin refused to assign leases to Liberty have reopened as ATAX locations in 2020 or 2021 (the "Shahabuddin Locations").  These Shahabuddin Locations are:  (i) 2104 Adam Clayton Powell Boulevard, which had had been in the Liberty system for 10 years; (ii) 502 East 138th Street, which had been in the Liberty system 13 years; (iii) 252 Willis Avenue, which had been in the Liberty system for 9 years; (iv) 2168 Westchester Avenue, which had been in the Liberty system for 12 years; (v) 750 Allerton Avenue, which had been in the Liberty system for 15 years; and (vi) 462 East Fordham Avenue, which had been in the Liberty system for 9 years. A true copy of a screenshot taken from ATAX's website listing five of the Shahabuddin Locations is attached as Exhibit F.

52.     These locations were all mature Liberty Tax locations which had operated continuously at the same locations in the Liberty system between 9-13 years.  Collectively, since 2014, they prepared more than 34,500 tax returns and generated more than $11,000,000 in revenue.

---

[1] Liberty and Shahabuddin subsequently executed a settlement agreement that superseded the PSA in certain respects, but Shahabuddin's obligations under the PSA relevant to this Complaint were left in full force and effect.

53.     After the PSA was executed in 2016, Liberty continued operating at the Shahabuddin Locations (through a Liberty franchisee who succeeded Shahabuddin) for several years after termination of Shahabuddin.  Shahabuddin never assigned the leases for the locations to Liberty, however, as he was required to do.  Instead, he sub-leased the locations to the successor Liberty franchisee.  After Liberty terminated the successor franchisee, Shahabuddin refused to assign the leases to Liberty.  Instead, he colluded with Defendants to convert the locations to ATAX franchises, upon information and belief, in 2020.

54.     Hewitt and the other Defendants tortiously interfered with Shahabuddin's performance of his valid contractual agreement to assign leases for the Shahabuddin Locations to Liberty.

55.      Hewitt, as Liberty's former CEO, knew the Shahabuddin Locations were particularly profitable Liberty franchise locations.

56.     Hewitt also knew that Shahabuddin had a contractual obligation to assign those leases for the Shahabuddin Locations to Liberty.  Hewitt signed the PSA on behalf of Liberty, and the PSA reaffirmed Shahabuddin's obligation to assign the leases to Liberty.

57.     Hewitt and Defendants induced Shahabuddin to breach the PSA's contractual obligations by conspiring with Shahabuddin to not assign the leases to Liberty as he was contractually obligated to do, but instead to open ATAX offices at those locations.

58.     Upon information and belief, based upon his knowledge gained during his employment as CEO of Liberty, Hewitt contacted Shahabuddin and induced him to breach the PSA, by causing the leases to be assigned to new ATAX franchisees instead of to Liberty.

59.     In furtherance of their scheme, Defendants have sought to conceal Shahabuddin's continuing involvement in the ATAX franchises now operating at the Shahabuddin Locations.

60.     Defendant Marte is Shahabuddin's sister-in-law.  She has acted effectively as a "straw-man" to help Hewitt and Shahabuddin accomplish their tortious conversion of the Shahabuddin Locations to ATAX franchises.

61.     In an attempt to conceal its wrongful conduct, ATAX recently removed Marte's name from the ATAX website, which had identified Marte as the designated "manager" for the Shahabuddin Locations.  A cached view of the locations portion of the ATAX website shows that Marte was listed as office manager for five of the Shahabuddin Locations in December 2020. Since then, however, ATAX removed Marte's name as the designated office manager and replaced it with "ATAX."  Those are the only locations for which the ATAX website does not list an individual manager.  Compare Exhibit G (a true copy of cached version of ATAX website location page), with Exhibit H (a true copy of current version of ATAX website location page).

62.     The legal entity operating the locations pursuant to New York State workers compensation search, is Hyatt Tax Solutions, Inc. The DOS Process address for Hyatt Tax Solutions is Shahabuddin's home address.

63.     As a result of Defendants' intentional interference with Liberty's contractual relationship, Shahabuddin breached the PSA and refused to sign over the leases as he had promised, and, upon information and belief, instead operates the locations as ATAX franchises in concert with Marte.

**G.     Palming Off the Shahabuddin Locations as Liberty Locations.**

64.     The Shahabuddin Locations are now operating as ATAX locations, but without ATAX signage or logos, even though ATAX generally requires its franchisees to display ATAX branding.

65.    The photographs below show that ATAX is attempting to deceive and/or confuse Liberty customers and other members of the community.

66.    Photograph 1 below depicts a typical Liberty location in New York City, and shows Liberty's trade dress and logos (the "Liberty Trade Dress and Logos"), which includes a red, white and blue color scheme, and having an American flag background on signage.  Photograph 2 below depicts one of the Shahabuddin Locations, the former Liberty location at 750 Allerton Ave, which ATAX now leases and operates.  The location is generically branded as "Income Tax" featuring an American Flag background, similar to other Liberty Tax locations in New York City as depicted in Photograph 1.  Photograph 3 below is a typical ATAX-branded location (the particular location is 5339 Broadway in the Bronx).



1                                        2                                        3

67.    Liberty has used the Liberty Trade Dress and Logos continuously and extensively at its franchise locations throughout New York City and the United States.  As a result of Liberty's continuous and extensive use of the Liberty Trade Dress and Logos, the Liberty Trade Dress and Logos has acquired valuable goodwill and developed substantial secondary meaning to customers.

68.    Defendants branded the ATAX franchises operating at the same locations as the former Liberty franchises with branding similar to the Liberty Trade Dress and Logos, including using the red, white and blue color scheme, and having an American flag background on the signage.

15

69.     Defendants are using signage and lettering at former Liberty locations that is deceitfully similar to the Liberty Trade Dress and Logos to confuse loyal Liberty customers into unknowingly having ATAX prepare their taxes, while thinking Liberty is doing so because Liberty operated continuously at these locations for at least nine years.

70.     ATAX employees in the former Liberty locations also tell customers who walk into the office that it is the "same people" who previously prepared their taxes, and that "only the name changed."

71.     Defendants are unlawfully converting Liberty's goodwill by misleading consumers to believe they are still doing business with Liberty, as Liberty has built the trust of its customers at this location and many similar locations which Liberty has operated for more than a decade.

**H.     Poaching Other Liberty Franchisees**

72.     Hewitt's recruitment of current and former Liberty franchisees is not limited to the Shahabuddin Locations or the New York metropolitan area.

73.     Defendants, individually and in combination, have reached out to a number of franchisees up and down the East Coast, interfering with the contractual relationships Liberty has with them and inducing them to breach in-term and post-term contract requirements.

*i.     Liberty Franchisee Darin Haynes*

74.     Darin Haynes ("Haynes") entered into a franchise agreement with Liberty during Hewitt's employment with Liberty, operating a Liberty franchise at 7804 East Brainerd Road, Suite 118, Chattanooga, TN 37421.

75.     Haynes represented to Liberty that he wanted to exit the tax preparation business, but that representation was false and was merely a ploy to convince Liberty to forgive his debt, and commence operating as an ATAX franchisee.

76.    Haynes had outstanding debt owed to Liberty, much of which Liberty forgave as a gesture of goodwill.

77.    Haynes's franchise agreement was terminated on August 9, 2019, so the post-termination non-compete and non-solicitation covenants will remain in effect until August 9, 2021.

78.    Soon after termination of Haynes' franchise agreement, Haynes, induced by Defendants, breached and continues to breach his post-termination covenants with Liberty by operating an ATAX franchise at the same location as his former Liberty franchise within the non-compete and non-solicitation period.

79.    The "Locations" page of the ATAX website (Ex. H), identifies the following location in Chattanooga ("ATAX Chattanooga Location"):

> ATAX - Chattanooga, TN
> 7804 East Brainerd Rd. SUITE 118
> Chattanooga, TN 37421
> Phone:  (423) 417-1890

80.    Photographs taken at the ATAX Chattanooga Location further show that it is being operated as a tax preparation business, to the detriment of Liberty and nearby Liberty franchisees. ATAX Chattanooga Location photographs are attached as Exhibit I.

### *ii.    Liberty Franchisee Tiffany Robertson*

81.     Tiffany Robertson ("Robertson") was another Liberty franchisee during Hewitt's employment with Liberty, operating a Liberty franchise at 1506-B Gault Avenue North, Fort Payne, AL 35967.

82.    After Robertson represented to Liberty that she wanted to exit the tax preparation business, Liberty and Robertson entered into a mutual termination of her franchise agreements, with debt forgiveness, on October 20, 2020.

83.     Robertson's representation false and was merely a ploy to convince Liberty to forgive her debt, and commence operating as an ATAX franchisee.

84.     Robertson's franchise agreement was terminated on October 20, 2020, so the post-termination non-compete and non-solicitation covenants are in effect and remain in effect until October 20, 2022.

85.     In the same month that Liberty agreed to mutually terminate its franchise agreement with Robertson, she announced on Facebook that she was working as a "Franchisee" at ATAX in Chattanooga, at same location as fellow former Liberty franchisee Darin Haynes.  A true copies of screenshot from Robertson's Facebook page is attached as Exhibit J.

86.     Under Federal Trade Commission ("FTC") regulations, all franchisors must provide their franchise disclosure document fourteen days prior to signing of any franchise agreement, so Robertson must have been in the process of joining ATAX and ATAX's franchise disclosure documents while she was still a Liberty franchisee.

87.     Additionally, Robertson did not turn over client files for her previous Liberty franchise location, in breach of the covenants in the mutual termination and franchise agreement.

### iii.     *Liberty Franchisee Donnette Darrow*

88.     This past fall, Hewitt induced Donnette Darrow ("Darrow"), a Liberty franchisee, to exit her Liberty franchise agreement via mutual termination.

89.     Darrow was a Liberty franchisee during Hewitt's employment with Liberty, for a franchise located at 41 Colvinhurst Drive, Buffalo, NY 14223.

90.     After Darrow informed Liberty of her plan to purportedly retire from working altogether, and that she no longer desired to operate as a Liberty franchisee, Darrow's franchise

agreement was terminated on December 22, 2020.  Her post-term non-compete and non-solicit covenants remain in effect until December 22, 2022.

91.     Darrow indicated in a recent Facebook post that she was leaving Liberty but would continue working in the tax preparation industry, and said in reference to Hewitt: "…John, I will be forever grateful for your guidance. You are one great man…" Hewitt responds with "TY [Thank You]."  A true copy of the Facebook printout is attached as Exhibit K.

92.     Defendants have tortiously interfered with Darrow's franchise agreement with Liberty as they were aware of the existence of the valid contract, including the post-term non-compete and non-solicitation covenants, and have induced Darrow to compete with Liberty for Defendants' benefit by soliciting Liberty customers on behalf of ATAX, in breach of the post-termination restrictive covenants in her franchise agreement.

### *iv.*     *Maurice Williams*

93.     Maurice Williams ("Williams"), in conjunction with his sister, former franchisee Tiffany Williams, operated multiple Liberty franchise locations while Hewitt was Liberty's CEO.

94.     Since termination of the applicable franchise agreements, Williams has been competing against Liberty in violation of the post-termination restrictive covenants in the franchise agreements, and in violation of a settlement agreement Williams and Liberty executed.  This Court (Allen, J.) has enjoined Williams from continuing to compete against Liberty.  *See JTH Tax LLC v. Williams, et al.*, 2:20-cv-00127-AWA-LRL, ECF No. 28.  That injunction remains in effect, and is the subject of a pending contempt and sanctions motion against Williams.

95.     Notwithstanding that Williams is subject to restrictive covenants *and this Court's injunction* which prohibit him from competing against Liberty, on January 19, 2021 Hewitt encouraged Williams to join ATAX in a Facebook message.

**I.**     **Hewitt's Email Solicitation of Liberty Franchisees, Employees, and Other Contacts**

96.     Hewitt, through Loyalty, has engaged in an extensive email campaign using contacts he gained during his employment with Liberty, including Liberty's investors, employees, and current and former franchisees, to seek investors in Loyalty.  A copy of the email (the "Loyalty Email") Hewitt sent is attached as Exhibit L.

97.     While the main focus of the Loyalty Email is to solicit Liberty's employees and customers to invest in Loyalty, the underlying message is that ATAX is far more successful than Liberty and that employees, investors, and franchisees alike should jump ship to ATAX.

98.     The Loyalty Email boasts of low cost initial investments while implying returns of twenty-fold.   Hewitt is well-aware of Liberty's confidential marketing strategy towards prospective investors and seeks to undercut Liberty's marketing attempts through Hewitt's false promises of lucrative success.

99.     Using contact information for investors, employers and franchisees that he obtained during his employment at Liberty is a further breach of the confidentiality provision of Hewitt's Employment Agreement with Liberty.

100.     Hewitt is using confidential information he acquired through his employment with Liberty to unfairly compete with Liberty and tortiously interfere with its various lucrative contracts across the United States.

**J.**     **Hewitt's Disclosure of Liberty's Confidential Information in Two Cases that Liberty has Pending**

101.     Hewitt has also recently breached his obligations under the Hewitt Employment Agreement by disclosing Liberty's confidential information to at least three counterparties in cases that Liberty has pending.

102.    In *Pitcairn Development v. JTH Tax, LLC*, Hewitt has provided two declarations in support of Plaintiff Pitcairn, speaking about internal policies of the company and otherwise providing confidential information in violation of the Hewitt Employment Agreement.  Hewitt was not subpoenaed for information; he voluntarily provided information in hopes of helping plaintiff "win" its case against Liberty.

103.    In another case, pending in this court, *JTH Tax, LLC v. Shahabuddin*, Hewitt recently provided Shahabuddin a declaration supporting his defense and speaking about internal Liberty policies, again in breach of the Hewitt Employment Agreement.   Hewitt was not subpoenaed in the Shahabuddin matter.   Hewitt provided this declaration in hopes of helping Shahabuddin defeat Liberty's claim.

104.    In yet another case filed just two days before the date of this Complaint, Hewitt submitted a letter to Liberty's litigation adversary and his counsel (who happens to be former in-house counsel at Liberty) in support of multi-million-dollar claims against Liberty, in the hopes of assisting the plaintiffs in their claims against Liberty – all in violation of the Hewitt Employment Agreement.  *Haddad, et al. v. JTH Tax, LLC*, Case No. CL21-441 (Virginia Beach Circuit Court, February 2, 2021).

## CAUSES OF ACTION

### COUNT ONE
*(Federal Trade Dress Infringement, Violation of the Lanham Act,*
*15 U.S.C. § 1125(a)(1), Against All Defendants)*

105.    Liberty repeats and re-alleges the foregoing allegations as if fully set forth here.

106.    Liberty has used a distinctive designation, including the Liberty Trade Dress and Logos, in interstate commerce in connection with the delivery of tax preparation services.

107.   Liberty has over 2,400 locations nationwide, including multiple locations in Virginia and New York.

108.   Consumers identify Liberty as the source of the tax preparation services based on the use of the Liberty Trade Dress and Logos.

109.   Defendants have used a combination of words, symbols, logos and/or trade dress that mimics the Liberty Trade Dress and Logos.  In fact, Defendants have use the designations as set forth above at former Liberty locations.

110.   Defendants' use and display of the Liberty Trade Dress and Logos without the consent of Liberty is likely to cause confusion among customers as to the source, sponsorship, affiliation or approval of the ATAX franchise business, and therefore constitutes trade dress infringement of Liberty's rights in the Liberty Trade Dress and Logos.

111.   Defendants' false association, false advertising, and use of the Liberty Trade Dress and Logos in order to palm off their franchise locations as Liberty locations has damaged Liberty, and has caused immediate and irreparable harm to Liberty.

112.   At some former Liberty locations that have reopened as ATAX locations, Defendants' employees have even told prospective customers that the ATAX locations employ the same tax preparers as the previous Liberty franchises, and that "only the name changed."

113.   As a direct and proximate result of Defendants' trade dress infringement, false association and palming off of their ATAX franchises as Liberty locations, Liberty has incurred and will continue to incur substantial losses, fees, and expense for which Defendants are liable in an amount to be proven at trial, including, but not limited to, compensatory damages and disgorgement of Defendants' profits.

## COUNT TWO
### *(Tortious Interference with Contractual Relations – Franchise Agreements – Against all Defendants)*
### *(Equitable and Monetary Claim)*

114.    Liberty repeats and re-alleges the foregoing allegations as if fully set forth here.

115.    The franchise agreements between Liberty and its franchisees, including the particular franchisees identified in this Verified Complaint, are valid and enforceable contracts.

116.    At all relevant times, Defendants were aware of Liberty's franchise agreements and knew the terms of Liberty's franchise agreements.  As the former Liberty CEO, Hewitt was aware of the standard terms and conditions of Liberty's franchise agreements.

117.    Defendants intentionally interfered with Liberty's franchise agreements with several franchisees, including those franchisees identified in Section H, above, and induced those franchisees to breach their franchise agreements with Liberty, including material breaches of Sections 4(d), 6(g), 9(b)-(e), (g)-(i), (k), 10(a), (b), and (d), and 12 of the respective franchise agreements.

118.    As a result of Defendants' intentional interference with Liberty's contractual relations, the former Liberty franchisees breached their franchise agreements with Liberty.

119.    As a direct and proximate result of Defendants' intentional interference with Liberty's contractual relations, Liberty has been damaged.

120.    Liberty has suffered, and will continue to suffer, irreparable harm unless the Court enjoins Defendants from further intentional interference with Liberty's franchise agreements.

121.    As a direct and proximate result of Defendants' intentional interference with Liberty's contractual relations, Liberty has incurred and will continue to incur substantial losses, fees, and expense for which Defendants are liable in an amount to be proven at trial, including, but

not limited to, compensatory damages, consequential damages, and disgorgement of Defendants' profits.

## COUNT THREE
### (Tortious Interference with Contractual Relations – the Shahabuddin Purchase and Sale Agreement – Against All Defendants) (Equitable and Monetary Claims)

122.   Liberty repeats and re-alleges the foregoing allegations as if fully set forth here.

123.   The PSA (Ex. E) between Liberty and Shahabuddin is a valid and enforceable contract.

124.   Defendants knew of the PSA between Liberty and Shahabuddin, and its relevant terms.  In fact, Hewitt signed the PSA on Liberty's behalf, as the former Liberty CEO, prior to the termination of his employment with Liberty.

125.   Defendants knew the PSA was a valid and enforceable contract.

126.   Defendants intentionally interfered with the PSA, inducing Shahabuddin to breach the PSA, as set forth more fully in Section F, above, including by failing to assign leases for the Shahabuddin Locations to Liberty.

127.   Shahabuddin did in fact breach the PSA.

128.   As a direct and proximate result of Defendants' intentional interference with Shahabuddin's PSA, Liberty has been damaged.

129.   As a direct and proximate result of Defendants' intentional interference with Shahabuddin's PSA, Liberty has incurred and will continue to incur substantial losses, fees, and expense for which Defendants are liable in an amount to be proven at trial, including, but not limited to, compensatory damages, consequential damages, and disgorgement of Defendants' profits.

## COUNT FOUR
### *Breach of Contract – the Hewitt Employment Agreement – Against Hewitt*
### *(Monetary and Equitable Claim)*

130.    Liberty repeats and re-alleges the foregoing allegations as if fully set forth here.

131.    The Hewitt Employment Agreement (Ex. A) is a valid and enforceable contract.

132.    Liberty has performed every obligation and condition required under the Hewitt Employment Agreement.

133.    Hewitt agreed in the Hewitt Employment Agreement that, following the termination of his employment with Liberty, he would not disclose or use any of the confidential and proprietary information he gained during his employment with Liberty for his own benefit or the benefit of any third party.

134.    Hewitt materially breached the Hewitt Employment Agreement.

135.    In breach of the Hewitt Employment Agreement, Hewitt disclosed Confidential Information to ATAX for Hewitt and ATAX's benefit, including the existence and terms of Liberty franchise agreements and the PSA described herein.

136.    Hewitt has also breached the Hewitt Employment Agreement by voluntarily providing Liberty's confidential information to at least two counterparties in cases that Liberty has pending.

137.    As a result of Hewitt's past, present, and potential breaches of the Hewitt Employment Agreement, Liberty has been damaged.

138.    Liberty has suffered, and will continue to suffer, irreparable harm, including, but not limited to: (a) loss of customer goodwill and loyalty; (b) loss of business opportunities and relationships to provide tax preparation services and related services; (c) loss of customers; (d) loss of profits; and (e) loss of franchisee stability; (f) loss of franchises; (g) breach of franchise agreements; (h) loss of ability to sell other franchises; (i) loss of value in confidential business

25

information; (j) loss of competitive advantage across the East Coast; and (k) attorneys' fees and other costs of suit.

139.    Monetary damages are an insufficient remedy because Defendants have caused, and continue to cause, irreparable damage to the value of Liberty's Confidential Information, goodwill, customer loyalty, and its ability to sell franchises, all of which are caused by Hewitt's ongoing violations.

140.    Unless his wrongful conduct is enjoined, Hewitt will continue to breach his obligations by continuing to breach the confidentiality covenants and continuing to disclose and use Liberty's Confidential Information.

141.    Hewitt is liable for damages resulting from the breach of his employment agreement in an amount to be proven at trial.

## COUNT FIVE
*(Unfair Competition Against All Defendants)*

142.    Liberty repeats and re-alleges the foregoing allegations as if fully set forth here.

143.    Liberty has used a distinctive designation, including the Liberty Trade Dress and Logos, in interstate commerce in connection with the delivery of tax preparation services.

144.    Liberty has over 2,400 locations nationwide, including multiple locations in Virginia and New York.

145.    Consumers identify Liberty as the source of the tax preparation services based on the use of the Liberty Trade Dress and Logos.

146.    Defendants have used a combination of words, symbols, logos and/or trade dress that mimics the Liberty Trade Dress and Logos.  In fact, Defendants have use the designations as set forth above at former Liberty locations.

147.   Defendants' use and display of the Liberty Trade Dress and Logos without the consent of Liberty is likely to cause confusion among customers as to the source, sponsorship, affiliation or approval of the ATAX franchise business, and therefore constitutes trade dress infringement of Liberty's rights in the Liberty Trade Dress and Logos.

148.   Defendants' false association, false advertising, and use of the Liberty Trade Dress and Logos in order to palm off their franchise locations as Liberty locations has damaged Liberty, and has caused immediate and irreparable harm to Liberty.

149.   As a direct and proximate result of Defendants' palming off its tax preparation services as Liberty's tax preparation services by their trade dress infringement, false association and palming off of their ATAX franchises as Liberty locations, Liberty has incurred and will continue to incur substantial losses, fees, and expense for which Defendants are liable in an amount to be proven at trial, including, but not limited to, compensatory damages and disgorgement of Defendants' profits.

## COUNT SIX
### *(Violation of the Defend Trade Secrets Act Against All Defendants)*

150.   Plaintiff repeats and re-alleges the foregoing allegations as if fully set forth here.

151.   The DTSA provides a private civil action for the misappropriation of a trade secret that is related to a product or service used in, or intended for use in, interstate or foreign commerce.

152.   Liberty owns numerous trade secrets, including without limitation, the Confidential Information defined in the Hewitt Employment Agreement, the substance of Liberty's franchisee performance tracking which provides metrics of which franchisees and franchise locations are most lucrative for Liberty, and Liberty's practices and policies regarding its franchisee relationships and how it approached and negotiated mutual terminations of franchise agreements

and debt forgiveness, which are used in interstate commerce, including all of the states in which ATAX operates.

153.    ATAX is engaged in interstate commerce.

154.    Throughout Liberty's existence, it carefully developed and refined the trade secrets, which are key ingredients of its continued success.

155.    The trade secrets provide Liberty independent economic value as it uses the same to procure and maintain franchisees, through competitive pricing and confidential and proprietary processes and procedures for opening and servicing such franchises.

156.    Liberty has taken extensive measures to preserve and protect its trades secrets for the purpose of maintaining its competitive advantage in the marketplace, as the same are only disclosed to Liberty's officers and management-level employees with a need-to-know and as described herein.

157.    Liberty took steps to prevent disclosure of trade secrets, including, but not limited to mandating those with access sign a non-disclosure agreement, and storing such information on password protected computers and servers to limit disclosure to authorized employees.

158.    Liberty's employees are granted access to the trade secrets only to the extent required by their employment.

159.    Liberty's disclosed trade secrets to Hewitt through his employment with Liberty for the sole purpose of fulfilling his duties on behalf of and for Liberty's benefit.

160.    By virtue of  Hewitt's senior-level position as a founder of Liberty and decades-long CEO and President, Liberty granted him access, commensurate with his position, to the decision-makers at Liberty's most coveted clients, including those franchisees described in this Complaint, as well as to its trade secrets so that he could service the same

161.    Liberty and Hewitt employed such trade secrets in obtaining franchisees and the respective contracts commensurate with same, and used trade secrets in all jurisdictions in which Liberty operates and used trade secrets in all jurisdictions in which ATAX operates

162.    In direct violation of his agreements with Liberty, Hewitt disclosed Liberty's trade secrets to ATAX, who has used the information to compete against Liberty.

163.    Hewitt unlawfully used the trade secrets he obtained while employed by Liberty.

164.    Liberty derived significant economic value through its pricing information and other information possessed by Hewitt by right of his employment as the CEO of Liberty, as it employed the same to procure and service franchisees, contracts and relationships which are worth millions of dollars.

165.    Hewitt intentionally misappropriated and disclosed Liberty's trade secrets for his and ATAX's economic benefit, with the intention and knowledge that his conduct would injure Liberty by, for example, causing Liberty to lose prospective business and current business with franchisees with individuals whom Hewitt and ATAX successfully solicited.

166.    Specifically, Hewitt diverted the trade secrets for the benefit of ATAX, ATAX Franchise, and Loyalty.  Each entity, upon information and belief, had involvement in enticing current and former franchisees to violate the non-competition covenants in the franchisee's respective franchise agreements.  Such franchisees are not only located in in New York, but other jurisdictions throughout the United States, such as in Tennessee.  ATAX, ATAX Franchise, and Loyalty all had an active role in committing such violations in New York.

167.    By his wrongful actions, Hewitt has knowingly misappropriated Liberty's trade secrets and confidential information in breach of his employment agreement with Liberty.

168.     Through his wrongful actions, including soliciting Liberty franchisee and interfering with its right to assignment of leases for profitable New York locations, Hewitt has knowingly misappropriated and used, or aided and abetted the misappropriation and misuse of, Liberty's trade secrets and confidential information.

169.     As a direct and proximate result of Hewitt's willful, improper, and unlawful disclosure of, and the other Defendants' willful, improper, and unlawful use of Liberty's trade secrets, Liberty has suffered and will continue to suffer immediate and irreparable harm.

170.     Pursuant to 18 U.S.C. § 1836(b)(3)(B), Liberty is entitled to recover damages for its actual losses, and to prevent Defendants' unjust enrichment.

171.     Pursuant to 18 U.S.C. § 1836(b)(3)(A), the Court should enjoin Defendants' use and misappropriation of Liberty's trade secrets.

172.     Defendants' misappropriation of Liberty's trade secrets is willful and malicious, thus warranting an award of exemplary damages under 18 U.S.C. § 1836(b)(3)(C), and an award of reasonable attorneys' fees under 18 U.S.C. § 1836(b)(3)(D).

## PRAYER FOR RELIEF

WHEREFORE, Liberty prays for judgment against Defendants as follows:

1.     For the following preliminary and permanent injunctive relief:

  a.     Enjoining Defendants, and all those acting in concert with them, from tortiously interfering with Liberty's franchise agreements, including post-termination restrictive covenants;

  b.     Enjoining Defendants, and all those acting in concert with them, from tortiously interfering with Shahabuddin's performance of the Purchase and Sale Agreement;

  c.     Enjoining Defendants, and all those acting in concert with them, from diverting or attempting to divert any leases from Liberty – including by opening ATAX franchises at locations where Liberty's former franchisees

were obligated to assign the leases to Liberty – for two years from any injunction order;

d.   Enjoining Defendants, and all those acting in concert with them, from palming off, including without limitation, palming off Liberty's trade dress and logos;

e.   Enjoining Hewitt, and all those acting in concert with him, from misappropriating, using or disclosing Liberty's confidential information; and

f.   Enjoining Defendants, and all those acting in concert with them, from using any of Liberty's confidential information.

2.   For a monetary award against Defendants in an amount to be proven at trial, including, but not limited to, compensatory damages, expectancy damages, punitive damages, and disgorgement of profits.

3.   For a monetary award against Defendants for Liberty's attorneys' fees and costs, in an amount to be proven at trial;

4.   For pre- and post-judgment interest; and

5.   For such other relief as the Court deems just and appropriate.

## <u>JURY DEMAND</u>

Liberty demands a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure

Date:  February 4, 2021

Respectfully Submitted,

**PLAINTIFF JTH TAX LLC D/B/A LIBERTY TAX SERVICE**

By its attorneys,

*/s/ Julia K. Whitelock*
Julia K. Whitelock, Esq. (VSB 79328)
GORDON REES SCULLY MANSUKHANI, LLP
1101 King Street, Suite 520

Alexandria, VA 22314
202.399.1009
202.800.2999 (Facsimile)
jwhitelock@grsm.com

Peter G. Siachos (Motion for Admission *pro hac vice* to be filed)
GORDON REES SCULLY MANSUKHANI, LLP
One Battery Park Plaza, 28th Floor
New York, NY  10004
646.808.6358
psiachos@grsm.com

James L. Messenger (Motion for Admission *pro hac vice* to be filed)
John W. Moran (Motion for admission *pro hac vice* to be filed)
Brian J. Wall (Motion for admission *pro hac vice* to be filed)
GORDON REES SCULLY MANSUKHANI, LLP
21 Custom House Street, 5th Floor
Boston, MA 02110
857.263.2000
jmessenger@grsm.com
jmoran@grsm.com
bwall@grsm.com

1226722/56401201v.1

DocuSign Envelope ID: 3E31B562-CB96-468D-9193-CA9019736E50

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### (NORFOLK DIVISION)

JTH TAX LLC d/b/a LIBERTY TAX
SERVICE f/k/a JTH TAX, INC.,

      Plaintiff,

v.

JOHN T. HEWITT; LOYALTY LLC;
ATAX LLC d/b/a ATAX; ATAX
FRANCHISE, INC.; and YNEVA MARTE,

      Defendants.

CASE NO. _____

## **VERIFICATION**

I, Brent Turner, am Chief Executive Officer of JTH Tax LLC d/b/a Liberty Tax Service ("Liberty"). I read the foregoing Verified Complaint, know the contents thereof, and state the allegations are true and correct. I base this Verification on my own knowledge, except as to matters therein stated to be alleged upon information and belief, and as to those matters, I believe them to be true and correct. The grounds of my knowledge, information, and belief are derived from my position as CEO of Liberty, my personal involvement in the events underlying this litigation, and general investigation of the facts and circumstances described in the Verified Complaint, including, without limitation, my review of Liberty's records and conversations with Liberty's employees, representatives and franchisees.

I verify under penalty of perjury that the foregoing is true and correct. Executed on February 4, 2021.

_____
Brent Turner